# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs May 27, 2014

## JAMES RAY MYNATT v. CHARLENE MYNATT LEMARR, ET AL.

**Appeal from the Chancery Court for Campbell County**
**No. 05-002      Andrew R. Tillman, Chancellor**

_____

### No. E2013-02347-COA-R3-CV-FILED-SEPTEMBER 9, 2014

_____

This appeal involves property that the plaintiff alleged was transferred by a deed with a forged signature.  The plaintiff filed an action to have the deed, filed over a decade earlier, set aside.  The defendants contended that the signature on the deed was an authorized assisted signature, and was recorded and published within a few days after it was made.  The defendants further asserted that they had no obligation to announce to anyone they had obtained the property.  The trial court found the plaintiff failed to carry the burden of proof necessary to void the deed.  The plaintiff appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

David H. Dunaway, LaFollette, Tennessee, for the appellant, James Ray Mynatt.

Terry M. Basista, Jacksboro, Tennessee, for the appellees, Charlene Mynatt Lemarr, Bobby Lemarr, Myron Ford, Patsy Ford, and Melissa Mynatt Hardy.

### OPINION

### I.  BACKGROUND

In 1958, Thomas C. Mynatt ("Father") received title to a 25-acre farm in Campbell County, Tennessee.  Father had three children with Beatrice Hatfield:  Thomas F. Mynatt,

Linda Mynatt Spencer,[1] and James Ray Mynatt ("Son"). Son is the plaintiff in this action. Father later married Anna Mae Mynatt. Three children were borne of that union: Charlene Mynatt LeMarr ("Daughter"), Patsy Mynatt Ford, and Melissa Mynatt Hardy. The farm was titled in Father's name individually. He never placed the name of Beatrice or Anna Mae onto the deed. Father died intestate on February 10, 1995.

With the exception of a military stint in Vietnam, Son lived on the farm continuously from his birth until 2002. Beginning at age 9, Son worked the farm with Father. During his military service, Son sent Father a check each month to assist with paying the farm's expenses. After his return to the United States, Son worked the farm with Father for the next 24 years. Son raised his own child, Jimmy, in a mobile home located on the property.

Daughter lived in the farmhouse with her parents and younger sisters until her 1984 marriage to Bobby LeMarr. The LeMarrs then purchased a mobile home and placed it on the farm. They remained in the mobile home until Father's death in 1995, at which time they moved into the farmhouse.

When Father's health started failing in the late 1980s, he turned over management of the farm to Son. According to Son, Father "couldn't hardly walk. He had to drag his feet to go to the bathroom or something. He couldn't pick his feet up and set them down. He had to scoot them." Son further noted that Father's "breathing was bad. He was on oxygen. And his back was bad. And he had cataracts on his eyes." Son testified regarding the work, development, repairs, and maintenance he performed on the farm and its structures from the time Father quit farming until 2002:

> I hired a dozer to come in and clean the farm up. We was building a barn, I think maybe some time in '90 to '92. It took us . . . when we would work a job, then we come in and work evenings on the barn and weekends. My son and me built it ourselves. It took us a couple of years to get it put up there.

Following Father's death in 1995, Son's activities of operating, maintaining and controlling the farm without contribution from other family members continued for the next seven years as they had always been. He rebuilt a barn in '98 or '99. He placed board and batten exterior siding on the house in 1996. He jacked up the house, poured a concrete footer, and placed a block foundation underneath the farmhouse. He continued to grow tobacco and claimed to pay the property taxes on the farm from the tobacco proceeds.

---

[1]Thomas F. and Linda signed a quit claim deed transferring any interest they had in the property to their brother, James.

Daughter testified that Father had emphysema and his hands shook, but he could walk. She asserted that Father was never on a walker or a cane. She further noted that Father had nothing wrong with his mind. Daughter admitted receiving cash from Son for taxes, but asserted that he was only paying for the assessment for his mobile home. Daughter confirmed that Son built the barn and that she did not invest in it. Daughter also acknowledged that Son ran cattle on the farm and put a new roof on and a foundation under the farmhouse in which the LeMarrs were living.

As a result of conversations with Father, Son states that he believed each of the six children would receive a portion of the farm following Father's death. Son testified:

Q:    Did you anticipate at the time of your dad's death you would have an ownership interest in the farm?

A:    Yes, Sir, he gave me a portion of the farm.

Q:    Did he ever give you a deed?

A:    No, Sir.

Q:    Did you understand that you would own that property, along with your other siblings?

A:    Every child was to [be an] heir.

* * *

A:    ... I knew that Charlene was to get the house, after Anna moved away, or at her death. . . .  She was to receive the house.

Q:    Why were you doing these improvements to that house if you didn't want the house, and you knew that the house was to be hers when the family divided up the farm?

A:    My father told me before he died how he wanted the house to - I mean, the house was to go to her, the land was to go to me, and make room for my brothers and sisters, if they ever wanted to come back, to have a place to build them a house.

Accordingly, Son contends he was unaware that a deed bearing the name and

purported signature of Father (along with the signature of Anna Mae, who had no interest) had been signed on December 14, 1991, transferring the entire 25-acre farm to the LeMarrs. The deed was recorded on January 23, 1992. Son asserts he did not learn of the deed until Daughter evicted him from the farm ten years later in 2002, seven years after Father's death.

Son claims the LeMarrs remained silent over the years and did not divulge to him that a deed had been recorded transferring all of the farm to them. According to Daughter, Father gave her the property "[b]ecause I was the only one always there and took care of them, did what they needed me to do." Mr. LeMarr confirmed that he did not discuss the deed with Son.[2]

Upon moving from the farm, Son went to the courthouse and located the deed at issue. Upon examining it, Son concluded it did not contain the authentic signature of Father:

Q:    When you got this deed from the courthouse, did you look at the signature line on it?

A:    Oh yeah.

Q:    Was it your father's handwriting?

A:    No, I don't think so. No, Sir.

The only witnesses to the execution of the 1991 deed still living are the LeMarrs. They maintain that they were in the law office of David Rogers for the signing of the deed on December 14, 1991. Daughter testified that the signature of Father on the 1991 deed is an assisted signature. In fact, she acknowledged that Father inquired of the attorney if his wife could sign his name for him and Mr. Rogers informed him that Anna Mae could only assist him. Daughter recalled the events as follows:

Q:    So what, if anything, was done?

A:    She assisted him to sign his name.

Q:    And how did she assist him in signing?

A:    She had her hand over the top of his hand to help him sign his name.

_____

[2]In his deposition, Mr. Bobby LeMarr claimed Father related to him that he had told Son.

Q: What did you observe done in the signing of that name?

A: She put her hand on top of his hand and helped him sign his name with her assistance.

Q: ... Whose hand held the pen?

A: My dad.

Mr. LeMarr also observed the execution of the deed:

Q: She signed Thomas Mynatt's name?

A: She helped him sign his name.

Q: Were you watching that?

A: Yeah.

Q: How much of it was he able to do on his own?

A: He started to sign it and his hand went to shaking and he told the attorney that his hand was shaking too bad, that he couldn't sign it, and he asked if Anna Mae could sign it for him. He told Tommy no, that she could help him sign it, but she couldn't sign it for him. She held his hand while he signed it.

Q: So do I understand your testimony is the same as your wife, that you sit there and you observe this and you're telling the Court under oath this signature of Thomas Mynatt that we see is one person putting their hand on another guiding their hand, that this is an assisted writing. That that complete writing is done by the hands of both Thomas and Anna's, is that your testimony?

A: No, this part right here, this squiggly part, that's where he started and he told the attorney that he couldn't hold his hand steady enough to write and she helped him to sign it –

* * *

Q:    I want to be very clear on this. You're telling the Court under oath that
      you observed, when this signature of Thomas Mynatt is put on this line,
      that it's done by the joint hands of both Thomas Mynatt and Anna
      Mynatt guiding him, that two hands wrote this name, that's what you're
      telling us?

A:    Yeah, she assisted him in writing his name.

The 1991 deed contains the following notary acknowledgment:

"Personally appeared before me David B. Rogers, a Notary Public for
Campbell County, Tennessee, Thomas C. Mynatt and wife, Anna Mae Mynatt,
with whom I am personally acquainted, (or proved to me on the basis of
satisfactory evidence), and who acknowledge that they executed the within
instrument for the purposes therein contained."

On January 5, 2005, Son filed a petition for declaratory judgment and partition of real
property against his sisters, Daughter, Patsy, and Melissa, and their spouses, as well as Anna
Mae.[3] In his petition, Son requested the trial court find that the 1991 deed, purportedly
signed by Father, transferring the real estate to the LeMarrs, did not contain the genuine
signature of Father, and the deed should be declared void. He claimed the property at issue
is owned by all six children of Father, as tenants in common, and should be subjected to a
sale by partition. Son filed an amended petition for declaratory judgment on July 9, 2012.

Son employed a noted forensic documents examiner, Thomas Vastrick,[4] to examine
the 1991 deed as well as writing exemplars of Father[5] and Anna Mae. Mr. Vastrick was of
the opinion that the 1991 deed did not contain the authentic signature of Father. He

---

[3] Anna Mae died on March 18, 2005, shortly after the litigation was filed.

[4] Mr. Vastrick has a B.S. degree in Forensic Science and participated in a two year forensic
documents residency program with the U.S. Postal Inspection Service Crime Laboratory in Washington, D.C.
He has been board certified by the American Board of Forensic Documents Examiners since 1982 and served
on its Board of Directors for eight years. He served as a Forensic Document Examiner for the U.S. Postal
Inspection Service and has been in private practice for 35 years. As a Forensic Document Examiner,
Vastrick has published one book, served as a contributing author on two textbooks, authored 30 research
papers and testified as a Forensic Document Expert in 300+ cases.

[5] Father had no formal education and could not read or write, except for his name.

explained his opinion as follows:

> Q: Now, will you explain to us how you reached your opinion that the signature that appears . . . is not the authentic signature of Thomas Mynatt[?]
>
> A: My examination involved the comparison of the relative skill level of the writer and the letter designs that were involved. It was my determination that the skill level that was shown in the known specimens that I had was at a lower skill level than that of the questioned signatures. That is a tell-tale sign of non-genuineness because the person cannot write better than they are normally capable of. In addition to that, I found distinct characteristic differences such as the design of the letter T, the design of the letter Y, and the position and design of the T crossings, just as a couple of examples.

Mr. Vastrick concluded that the signature of Father was authored by the hand of Anna Mae and was clearly not a guided "assisted" signature:

> Q: ... [I]f there is testimony in the record that another person took the hand of Thomas Mynatt and guided it across the line writing the complete name Thomas Mynatt by that hand being held and guided, what would be your response to that statement as to whether or not that is a guided, assisted signature as opposed to being a signature that's done by a person other than Thomas Mynatt?
>
> A: It's my opinion that it is not a guided hand signature, clearly not a guided hand signature.
>
> Q: Clearly not?
>
> A: Yes.
>
> Q: And why do you say clearly not?
>
> A: Because guided signatures by their very nature are very - they're not smooth and are very erratic in the writing, very angular in the writing, and the writing will go off several different directions, and there's two main reasons for that. One is that the guider's primarily using arm movement rather than hand and finger movement and it's the hand and finger movement that creates the very intricate portion of handwriting

design, whereas the arm creates rather gross, large, angular movements. You don't get the smoothness of strokes or the very fine details. There's very smooth writing on here relatively to what you would expect with guided handwriting because it kind of looks like the chicken scratch you would expect of a two year or three year old with a crayon because they're essentially using the arm stroke too. So because of that, this doesn't show any characteristics along that line. Plus the fact that where there's a guided hand, you're having a conflict of movement between the guider and the person being guided. The person being guided will quite often be wanting to go one direction, where the guider wants to go in the other and that creates additional conflict, and you see that in the writing because the writing will start in one direction and suddenly go another. So I can't emphasize enough that guided handwriting you see very gross movements all over the place. You do not get smooth writing anywhere near the type of writing that's reflected in any of these questioned signatures.

Q: Clearly not a guided signature?

A: Clearly not in my opinion.

Q: Is it clearly the signature of a person other than Thomas Mynatt?

A: Yes.

The time line of Son's knowledge of the 1991 deed resulted in testimony regarding an additional deed executed in 1993 that conveyed six acres of the original 25 acres to his sister Patsy and her husband, Myron Ford. The 1993 deed bears the signatures of Father,[6] Anna Mae, and the LeMarrs as grantors. According to Son, following Father's death in 1995, Anna Mae and Daughter both represented to him that Patsy and her husband had tricked Father into giving them the property. In 1997, they asked him to help secure a return of the land from the Fords, and at the request of Anna Mae, he drove her alone to the law office of Michael Hatmaker and paid an $800 fee on her behalf.[7] Son observes that despite

---

[6]Son opined that Father's signature on the 1993 deed also was not authentic.

[7]Daughter testified that she rode to the attorney's office with Anna Mae and Son and sat with him in the presence of the attorney to discuss both the 1993 deed and 1991 deed. Daughter testified:

Q: How did you get there, and who was present in Mike Hatmaker's office?

(continued...)

his awareness of the existence of the lawsuit, neither Anna Mae nor the LeMarrs advised him of the nature or outcome of the litigation. The complaint filed in Campbell County Chancery Court, case number 14,392, *Anna Mae Mynatt vs. Myron and Patsy Ford*, was filed May 16, 1997, and an order of compromise and dismissal was entered May 3, 1999. As a result of the action, two of the six acres were deeded back to the LeMarrs and Anna Mae.[8] Son claims that he did not see the 1993 deed until after he filed this cause of action in 2005, at which time the 1993 deed was shown to him by the Fords.

Interestingly, the LeMarrs were not parties to the 1997 litigation over the 1993 deed, although they had title to the entire 25 acres by virtue of the 1991 deed, and the six acres recited in the 1993 deed was part of the 25 acres.[9] The 1993 deed contains a notary acknowledgment confirming that Father, Anna Mae, and the LeMarrs appeared before a

---

[7](...continued)
A: Jim drove us down there. It was me, my mom, and my brother. Mom went down to discuss with Mike Hatmaker to get that land back from Patsy and Myron.

Q: What was discussed? And your brother, James Mynatt, was in the room?

A: Yes he was.

Q: And what was discussed?

A: It was discussed about the deed.

Q: Which deed?

A: Our deed.

Q: And -

A: And wanting the acres put back on our deed. And Jim told me he wanted the two point whatever acres it was, put on the original deed.

[8]The remaining four acres with the house built by the Fords ultimately was lost in foreclosure.

[9]She testified under cross-examination:

Q: Well if you own the 25 acres, and you're in the law office with the lawyer and your brother, why aren't you a party to this lawsuit against the Fords, since you and your husband own the 25 acres? Why aren't you all parties to the lawsuit?

A: That I cannot tell you.

notary who acknowledged their signatures. Mr. LeMarr, however, could not vouch for the authenticity of Father's signature on the 1993 deed and conceded the notary acknowledgement was false, for he did not appear before the notary. Mr. LeMarr testified:

Q:    You were here this morning when we looked at the other Deed with your wife. When this deed was done in 1993 to Myron and Patsy Ford, were you present when everybody signed it?

A:    Not when everybody signed, no.

Q:    Who was present when –

A:    The paper was brought down to the trailer for me and my wife to sign.

Q:    Who brought it to the trailer?

A:    Patsy and my mother-in-law.

Q:    So you didn't even appear before a notary?

A:    No.

Q:    So where this notary says on here that you and Charlene appeared before him and signed this 1993 Deed, that is not correct?

A:    No.

After a bench trial was conducted on September 9 and 10, 2013, the trial court entering its order on October 2, 2013, finding that Son did not carry the burden of proof necessary to void the deed and dismissed the complaint. In pertinent part, the court ruled as follows:

The Plaintiff's position is that Thomas Mynatt's hand was too shaky to sign a deed in 1991. His sister's explanation of how her father signed the deed is that the elderly Mr. Mynatt's wife, Anna Mae Mynatt, placed her hand over the top of his and assisted in guiding his signature.

The Plaintiff's forensic document examiner, Thomas Vastrick, testified at trial that Thomas Mynatt's signature is "clearly" not an assisted signature such as described.

-10-

The Defendants, on the other hand, take the position that their testimony is convincing and believable and that even if it were not, the notarized signature on a deed cannot be impeached. The deed under attack bears the following notarization:

> Personally appeared before me, David B. Rogers, a notary public for Campbell County, Tennessee, Thomas C. Mynatt and wife, Anna Mae Mynatt with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged they executed the within instrument for the purpose herein contained.

David B. Rogers signed the notarization on December 14, 1991. The document bears his seal and oath.

The Court notes that the Plaintiff, after having been ordered to prepare proposed findings of facts and conclusions of law, including any authority on the presumption of regularity in a notarized document and the effect of a forgery, has not cited the Court one case in which a long-recorded deed with a notarized signature has been set aside for forgery. On the other hand, the Defendants' have cited the case *Kyle v. Kyle* and cases cited therein for the proposition that the party attacking a notarized deed has the burden of proving by "full, convincing, and conclusive" evidence that the deed was forged and the acknowledgment was somehow false. In *Kyle v. Kyle*, 74 S.W.2nd 1065 (Tenn. Ct. App. 1934), the "issue presented [was] whether or not Robert C. Kyle signed and acknowledged a deed dated May 13, 1916, purporting to convey" an interest in land to a Mr. Garrett. "The deed was registered on the day it bears date. It bears a certificate regular in form to the effect that the bargainer, Robert C. Kyle, acknowledged that he executed the instrument for the purposes therein contained." *Id.* at 1065. Mr. Kyle denied "that he at anytime signed any deed or other instrument which conveys, or purports to convey, any interest" in the land and he further denied that he appeared before a notary public or was acquainted with the notary public who notarized the deed. At trial,

> Robert C. Kyle testified that he never signed or acknowledge the deed, never received a check, nor endorsed it; and that his name, as signed to these papers, was a forgery. He [was] very plain and emphatic in his testimony. He said that he never knew of the existence of this deed even though it was of record, until

-11-

shortly before this suit was brought.

The Chancellor ruled in favor of Mr. Kyle, that the deed was forgery and that he did not convey his interest away. On appeal, even though no one attacked Mr. Kyle's character or credibility, the Chancery Court was reversed. The Court of Appeals recounted all of the evidence supporting a finding that the deed was a forgery, and then found as follows:

> On the other hand, we have a deed regular in form and a check endorsed relating to a transaction which is very likely to have been consummated. The presumption is in favor of the validity of these papers. The testimony of the grantor alone is insufficient to invalidate the deed. The other evidence does not satisfy this Court that the signatures are forgeries, even when taken in connection with the testimony of Kyle himself. We do not know absolutely what is the truth about this matter. The burden was upon the cross-complainant, Kyle, to establish by clear, satisfactory, and conclusive evidence that the deed is a forgery. The evidence which has been adduced does not fulfill these requirements, in our opinion. Therefore the decree of the Chancery Court will be reversed and the cross-bill of Robert C. Kyle will be dismissed.

*Id.* at 1069.

The controlling rationale seems to be found in the Court's discussion of *Kennedy v. Security Bldg. & Savings Association* (Tenn. Ch. App.) 57 S.W.388, 394 as set forth at pages 1067 and 1068 of *Kyle*.

> In *Kennedy v. Security Building & Savings Association* . . . it was held that a deed of trust should not be set aside on the unsupported testimony of the complainant, a married woman, that she did not appear before the officer and acknowledge the deed, and that his certificate was false. The notary public taking the acknowledgment acts judicially and the duty is imposed upon him by law of ascertaining the truth of the matters about which he is to certify. In the opinion in that case it is recited that in *Lickmon v. Harding*, 65 Ill. 505, a deed properly certified and acknowledged on its face was assailed on the ground that the certificate of acknowledgment was false and a forgery, and

that the party never appeared before the officer; that the Court held that the certificate could not be overthrown by the unsupported testimony of the grantor, saying: "Public policy requires that such an act should prevail over the unsupported testimony of an interested party, otherwise there would be but slight security in titles to land. If the magistrate, in taking the acknowledgment, acts judicially, the duty is imposed upon him by law of ascertaining the truth of the matters about which he is certifying. Parties act on the faith of this certificate, and, in the absence of fraud and collusion, it must be entitled to full credit."

In this state it has been definitely held that the act of the certifying officer is in the nature of a judicial act, an essential part of the conveyance, and the probate of it can only be attack for fraud. *Shields v. Netherland*, 73 Tenn. 193, 5 Lea. 193.

This Court is convinced that if the grantor himself cannot overthrow a deed by testifying that he did not appear before the notary and that he did not sign the deed, the same result must follow when a expert witness, based upon his examination of the document, testified that someone else must have signed the deed because it could not have been signed by the grantor. The Court also notes that according to the dictates of *Kyle*, it is not enough that the evidence preponderates in favor of the person attacking the deed; rather the evidence must be clear and convincing. The Court was able to observe the demeanor of the Plaintiff's expert Mr. Vastrick, and the Court believes that his testimony, when viewed in light of the presumption of regularity and compared with people who were there, is somewhat speculative. He gave very little in the way of specifics to explain how it is that the interactions of Thomas Mynatt and his wife would not have produced the "assisted" signature on the deed. The bottom line is that the Court does not view Mr. Vastrick's testimony as clear and convincing evidence to set aside the deed.

The Plaintiff makes much of the fact that the Defendants did not inform him of their deed and that he allegedly did not find out [about] the deed until 2002. However, the deed was recorded in January of 1992 after its execution in December of 1991. Further, the Court is not convinced that James Mynatt did not know of the Defendants' interest in the property until 2002. James Mynatt played a part in a lawsuit brought by his stepmother against his sister Patsy Ford in 1997. In that case, the allegation is made in paragraph five (5) of the complaint that "[Anna Mae Mynatt], along with her then husband, deeded

certain property to another son-in-law and daughter Bobby LeMarr and Charlene LeMarr, which property is described by deed of record at Warranty Deed Book 306, 241, in the Campbell County, Tennessee Register of Deeds Office at Jacksboro." James Mynatt admitted at the trial in the present case that he took his stepmother, Anna Mae Mynatt, to Attorney Mike Hatmaker's office and hired Mr. Hatmaker to represent Anna Mae Mynatt in the 1997 lawsuit, the object of which was to revoke a deed made from the Defendants to Myron Ford and Patsy Ford.

Apparently, the Plaintiff wants this Court to order the Defendants to pay him compensatory damages for certain improvements he made on the family farm. However, at the time he made the improvements, he had, at best, a hope that he would inherit along with five (5) siblings. Further, the evidence confirms that James Mynatt derived some economic benefit from making the improvements in that he used them in a farming operation that he conducted with his father until Thomas Mynatt died and then on his own behalf after the father died. Furthermore, the recorded deed was notice to all the world, including the Plaintiff, that someone else owned the land as of 1991. Accordingly, the Court is not inclined to award damages against the Defendants. Moreover, the Court is unaware of any specific testimony as to the dollar amount of the alleged damages.

In summary, the Plaintiff failed to carry the burden of proof necessary for voiding the deed or awarding damages. The Plaintiff's complaint is dismissed with prejudice with cost taxed to the Plaintiff.

Plaintiff filed this timely appeal.

## II. ISSUES

The issues raised on appeal by Son are restated as follows:

a.) Did the trial court err in disregarding the testimony of the expert by finding it to be speculative.

b.) Did the trial court err by disregarding that the deed failed to contain the notary acknowledgment required by Tennessee Code Annotated section 66-22-107(c).

c.) Did the trial court err in finding that the testimony of the LeMarrs was more credible than the testimony of Son on the issue that Son was not aware of the recording of the 1991 deed until 2002.

## III.  STANDARD OF REVIEW

This court will review the trial court's findings of fact de novo upon the record, according a presumption of correctness to the findings.  Tenn. R. App. P. 13(d); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); *Keaton v. Hancock Cnty. Bd. of Educ.*, 119 S.W.3d 218, 222 (Tenn. Ct. App. 2003).  We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence.  *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000).  If the trial court's factual determinations are based on its assessment of witness credibility, this court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).  No presumption of correctness attaches to a trial court's conclusions of law.  *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

Son has the burden of establishing under a clear, cogent, and convincing evidence standard that it is highly probable that the deed in issue is a forgery.  However, the trial judge observes the witnesses face to face, hears their testimony and observes their demeanor on the stand, and thus the trial judge is the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn.1966).

## IV.  DISCUSSION

Son contends the trial court failed to appreciate the clear, cogent, and convincing proof that the 1991 deed was a forgery.  A forged deed is "null and void upon its execution." *Beazley v. Turgeon*, 772 S.W.2d 53, 59 (Tenn. Ct. App. 1988).  It is well settled that to set aside a deed on the grounds of fraud, the proof thereof must be clear, cogent, and convincing. *Myers v. Myers*, 891 S.W.2d 216 (Tenn. Ct. App.1994); *Pugh v. Burton*, 166 S.W.2d 624 (Tenn. Ct. App.1942); *Anderson v. Howard*, 74 S.W.2d 387 (Tenn. Ct. App.1934).  The standard set forth in *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995) defines the proper standard:

> The "clear and convincing evidence" standard defies precise definition.
> *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App.1989).  While it is more
> exacting than the preponderance of the evidence standard, *Santosky v. Kramer*,

455 U.S. [745,] 766, 102 S.Ct. [1388,] 1401[(1982)]; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App.1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App.1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App.1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn.1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App.1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App.1985).

*O'Daniel*, 905 S.W.2d at 188.

The trial court was able to observe the demeanor of Son's expert. It determined that his testimony, when viewed in light of the presumption of regularity and compared with people who were there, was somewhat speculative. The bottom line is that the court did not view Mr. Vastrick's testimony as clear and convincing evidence to set aside the deed.

The uncontroverted proof reveals that Father was physically present at the execution of the 1991 deed. He attempted to sign his name (hence the appearance of the "mark"), but because of a physical condition which caused his hand to shake, he found he was unable to physically sign his name legibly by himself. Anna Mae placed her hand over his hand and assisted him in making the signature which appears upon the deed. There was no testimony or proof that Father resisted his wife in assisting him to place his name upon the 1991 deed or that he objected to her doing so. There is no proof that Father was mentally incompetent or under any physical disability such as would prevent him from executing the 1991 deed or such as would prevent him from formulating the intent to execute thereby the 1991 deed. The testimony of Son's expert witness did not in any way contradict the testimony of the LeMarrs of how that "squiggly" mark was made at the beginning of Father's signature on the 1991 deed.

The acknowledgment placed upon the 1991 deed provides as follows:

"Personally appeared before me, David B. Rogers, a Notary Public for Campbell County, Tennessee Thomas C. Mynatt and wife, Anna Mae Mynatt, with whom I am personally acquainted, (or proved to me on the basis of

-16-

satisfactory evidence), and who acknowledged that they executed the within instrument for the purposes therein contained."

This acknowledgment by the notary public is consistent with the testimony of the LeMarrs that Father caused his signature to be written upon that deed with the intent to convey the property to the LeMarrs as evidenced by the deed itself. A notary public's certificate means a great deal more than the "Good Housekeeping Seal of Approval." *Beazley*, 772 S.W.2d at 59. When a notary public properly acknowledges a instrument he or she "says to the world that the execution of the instrument was carried out according to law," and anyone who relies on the instrument should be able to assume its validity. *In re Marsh*, 12 S.W.3d 449, 453 (Tenn. 2000) (quoting *Beazley*, 772 S.W.2d at 59). Because a notary is a public official of the state of Tennessee and discharges his or her duties under oath, it is presumed that a notary public has acted lawfully. However, that presumption of correctness may be rebutted by the party challenging the document. *Manis v. Farmers Bank of Sullivan Cnty.*, 98 S.W.2d 313, 314 (Tenn.1936). The presumption that a notary public has performed his or her duty does not prevail over contrary proof. *Id.*

Upon review, under the facts before us, there is no clear and convincing evidence that Father did not intend the signature appearing upon the 1991 deed to be his signature or that he did not intend to convey the property to the LeMarrs. We find it significant that Father was present before the notary. Both of the LeMarrs who were present at the signing of the deed claim the signature was intended as Father's signature. The acknowledgment of the notary public that the signatures on the 1991 deed are authentic and intended "for the purposes therein contained" substantially complies with the statutory requirements. Accordingly, the proof supports the determination of the trial court in favor of the LeMarrs and the validity of the 1991 deed.

In regard to the form of the acknowledgment used, Son asserts that the 1991 deed is defective because it did not contain the proper notary form authenticating the signature. He relies on *In re Crim*, 81 S.W.3d 764 (Tenn. 2002), in which the Tennessee Supreme Court noted:

> The notary failed to use the prescribed statutorial form of acknowledgment, with a result that the certificate of acknowledgment contains false statements and indicates a lack of compliance with TCA 66-22-101 and 101(c). In order for an instrument to be legally registered, it must bear evidence of proper acknowledgment.

*Id.* at 769-770. Son therefore contends that since the notary failed to use the prescribed statutory form of acknowledgment on the 1991 deed, it is not effective to establish a valid

deed.

In *Hindman v. Moore*, No. E2005-01287-COA-R3-CV, 2006 WL 1408394 (Tenn. Ct. App. May 23, 2006), this court held that *In re Crim* does not stand for the proposition that a flawed acknowledgment will render a deed null and void. Rather, the opinion provides that a flawed acknowledgment is not legally registered. Such a deed would be therefore void as to "subsequent creditors or bona fide purchasers without notice." *Id.* at *5. We further noted that such a deed would still be valid as to "parties to the same, and their heirs and representatives." *Id.* Accordingly, any flaw in the acknowledgment would not void the 1991 deed as to these parties.

With respect to Son's last issue, the LeMarrs promptly recorded the 1991 deed within a month of execution, and the local newspaper published a notice of the property transaction. This registration placed Son, as an heir, on constructive notice. *In re Marsh*, 12 S.W.3d 449, 454 (Tenn. 2000). The LeMarrs were under no duty to notify Son or anyone else of the 1991 deed.

## V. CONCLUSION

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, James Ray Mynatt. The case is remanded for collection of costs below, pursuant to applicable law.

_____
JOHN W. McCLARTY, JUDGE